49 311
77 559

ISAAC S. HURT ET AL. V. JOHN P. EVANS ET AL.

1. CASES APPROVED.—As to admissibility of declarations of deceased persons touching boundaries, see Stroud v. Springfield, 28 Tex., 626, and Hurt v. Evans, 34 Tex., 111.

2. DECLARATIONS OF DECEASED PERSONS AS TO BOUNDARIES.—The declarations of a deceased grantee of a tract of land as to the boundaries of subdivisions of the tract sold by him, in regard to which he is not interested, are competent.

3. SAME.—The declarations of a deceased owner of a tract of land as to corners of the tract of which he was in possession at the time they were made, are admissible in a contest as to the location of such corners and lines.

4. SAME—LIMITATION OF RULE.—Declarations after suit, and by a party never having been interested in the lands, are not competent testimony to prove the location of division lines.

5. CHARGE OF COURT—DETERMINING THE EFFECT OF WRITTEN EVIDENCE.—A decree of partition was introduced in evidence; the plat and field notes made by the commissioners of partition, making part of the decree, were in conflict. It was competent and proper for the court to instruct the jury as to the meaning of the decree, and to instruct that the field notes in the decree were conclusive among the parties, when the decree named the field notes as determining the boundaries.

6. MAPS WITH CONTRADICTORY FIELD NOTES.—A map accompanying' and forming part of a report by commissioners making partition of land, will not necessarily control field notes also forming part of such reports, where there is a difference in the length of lines as given in figures on the map, and as written in the field notes.

### ON MOTION FOR REHEARING.

7. PRACTICE IN SUPREME COURT.—Suggested by the court, that, in motions for rehearing, it will ordinarily be sufficient to point out in such motion briefly some mistake, or misconception of law or fact, into which the court has fallen, as exhibited in the opinion, with such reference to the record or to authorities as will call it to the attention of the court.

ERROR from Washington.  Tried below before the Hon. I. B. McFarland.

The James Lynch league of land is situated on the right or west bank of the Brazos.  June 19, 1835, Lynch conveyed to Martin Allen, without metes and bounds, one-fourth of the league, being the upper quarter.  This quarter, by consent of all parties, seems to have been the west half, or part of the upper half, of the league, when divided by a line from the river and parallel with the side lines of the grant.

December 20, 1837, Lynch sold to —— Lawrence one labor out of the upper half, being, it seems, surveyed out with marked lines, and its situation on the league is a square bounded north by the upper line of the grant, and on the west by the quarter league sold to Allen, its sides being 1,000 varas each.

A few days after the sale of the labor to Lawrence, December 29, 1837, Lynch sold to Gay and Crosby " all of the lower quarter except the labor, being 934 acres, more or less."  This tract was considered by all parties, regardless of the description as the lower quarter, as conveying the balance of the east half of the upper half of the league grant; the subdivisions of the upper half being the Allen quarter, the Lawrence labor, and the 934-acre tract sold to Gay and Crosby.

Gay purchased Crosby's interest in the 934-acre tract, and after his death the tract was divided, by proceedings had in

the Probate Court, and the lower or south part of the tract was allotted to the widow of Gay. The widow afterwards married, and, with her husband, December 13, 1859, conveyed her interest to J. P. Evans, their deed reciting: "The tract hereby conveyed is the lower part of the said described tract, being lot number 2 in the division between the heirs of Thomas Gay, deceased, said tract containing 624 acres."

J. S. Hurt became the owner of the Allen quarter of the league.

From the southwest corner of the Lawrence labor is a marked line, an extension of the west line of the labor, to the division line dividing the league. Another marked line runs parallel to it, and 361 varas further east, and from the south line of the labor to the same division line.

The land bounded by these lines—east and west by said marked lines, and north by the labor, and south by the division line—was claimed by both Evans and Hurt.

Evans brought an action of trespass to try title against Hurt for the land.

The testimony adduced by each party was directed to establishing the existence of a marked line, fixing the boundary as claimed by each respectively. Most of the testimony was hearsay—declarations of deceased parties. The charge of the court and the testimony are sufficiently given in the opinion.

*Giddings & Morris,* for plaintiffs in error.

*Sayles & Bassett,* for defendants in error.

ROBERTS, CHIEF JUSTICE.—Though there are numerous questions raised in this case, it may be determined by a consideration of very few of them.

James Lynch sold the upper quarter of his league of land, situated on the Brazos river, to Allen, in 1835. The deed contains no description of boundaries to the tract sold. There is no evidence in the record that the land was run out at the time it was sold. It might well be presumed, that the intention of the parties was that it should be run out in a square or parallelogram, in the northwest corner of the league, by straight lines.

On the 20th of December, 1837, James Lynch sold to Lawrence a square labor of land, situated on the northern line of the league, and being described in the deed with field notes, exhibiting lines and corners, that were fully established on the trial. It was not contended that any part of this labor conflicted with the upper or northwest quarter sold to Allen. There was no dispute about the title to this labor, or any part of it. The field notes call for commencing in the prairie on the north boundary line of the league, and do not state the distance from the northwest or northeast corners of the league. Although the testimony of Lawrence was taken in the case, it was not shown why the labor was selected at that particular locality. That it was designed to locate this labor east of and adjoining to the Allen tract, may be inferred, not only

from its locality on the ground as shown by the plat of the survey, but also by a fact recited in another deed, made by James Lynch a few days afterwards, to an adjoining tract, which will now be referred to.

On the 29th of December, 1837, James Lynch sold to Gay and Crosby, by a deed describing the land sold as follows: "On the right bank of the river Brazos, being a part of the league of land granted to me by the Mexican Government as a headright, being all of the lower quarter of said league, except one labor of land which I previously sold to Joseph Lawrence, and surveyed by Joseph B. Chance." This deed purported to convey 930 acres of land, more or less.

From these recitals, it may be inferred that the Lawrence labor was in the lower quarter; that it, with the tract sold to Gay and Crosby, contained the whole of the lower quarter; and, by the use of the words "more or less," that there was a line run, then or previously, separating the upper from the lower quarter. There is no certain evidence that such a line had then been run, or that any dividing line had ever been agreed upon by the parties interested. Two lines are found on the ground south of the Lawrence labor, claimed respectively by the parties to the suit to be such dividing line. One of them is an extension southward of the western boundary line of the Lawrence labor, and the other is a parallel line east of it 361 varas, embracing between the said lines 67 acres of land, which is the subject of controversy in this suit.

The plaintiff below contends that his land, being a part of the lower quarter, extends to the line corresponding with the western boundary line of the Lawrence labor, making a straight line through the north half of the league; and defendant contends that his land, being part of the upper quarter, extends to the line 361 varas east of that line, making a broken line.

The jury found a verdict in favor of the plaintiff, thereby establishing the straight line as the correct divisional line between the two quarters. Although the evidence was conflict-

ing, it sufficiently sustains the verdict as to prevent a reversal of the judgment upon the facts of the case. The instructions of the court, as to the proper mode of ascertaining the true divisional line, are unobjectionable.

The effort on both sides was to establish the true line by presumption arising from the deeds, and from the claim made by those owning each tract, as exhibited in their deeds and by their acts, and by the reputation in the neighborhood as to what was regarded as the true divisional line, and by the declarations of James Lynch and other persons of the neighborhood, who were dead at the time of the trial. A discussion of the evidence would only exhibit a conflict, with a preponderance in favor of the plaintiff sufficient to sustain the verdict.

The defendant took exception to the ruling of the court in admitting the declarations of James Lynch, deceased, as to the true divisional line, made after he had sold the said three tracts of land, because it was not shown that he had seen the line run, &c. Surely, if the declaration of deceased persons, in reference to ancient boundaries of land, are admissible at all, as it has been held by this court, those of James Lynch, the grantee of the land, who lived on his league, and sold all three of these tracts, would be of the very highest authority, having been made when he had no interest whatever in favor of one or the other party. (Stroud *v.* Springfield, 28 Tex., 665; Evans *v.* Hurt, 34 Tex., 111, and authorities cited.) The objection to the declarations of Thomas Gay, deceased, in pointing out a corner of the Gay and Crosby tract, is equally untenable, because it was merely a claim of ownership to the land bounded by that line of which he was then in possession.

The defendant also took exceptions to the ruling of the court in excluding the declarations of W. R. Allen, deceased, made after this suit was brought, he not being shown to have been in possession, in reference to the true divisional line. This was not an error. (1 Phillips' Ev., 264–266.)

There are but two charges of the court that require notice, which can be understood only by a rehearsal of some of the facts of the case.

Gay became the owner of the whole tract conveyed to him and Crosby, and, having lived upon it many years, died, and it was partitioned between his children and his wife, afterwards Mrs. Roberts, the wife of Luke Roberts. To Mrs. Roberts was allotted the south part of the Gay tract, in a regular partition ordered and confirmed by the County Court, in the distribution of the estate of Thomas Gay.

The defendant contends, that if the divisional line claimed by the plaintiff is the true line between the two quarters, still the land in controversy was not included in the tract set apart to Mrs. Roberts in the partition, because the plat of the survey, made by the surveyor who aided the commissioners in dividing the land, indicates the broken line as the divisional line between the quarters, which would leave out of Mrs. Roberts' allotment the land in controversy; and the plaintiff, deriving title from Mrs. Roberts, with a description in the deed referring to the partition as indicating the land conveyed by her, could claim no greater right than was conferred upon her in the division of the land between her and the children. By the calls in the field notes of the survey, the land allotted to Mrs. Roberts would include the land in controversy, if, as the jury found, it belonged to the lower quarter sold to Gay and Crosby; but on the plat made by the surveyor, in connection with the field notes, the length of a line in the survey was indicated by the figures 708, which would have made her portion fall short, and would have left most of, if not all, the land in controversy undivided, and still belonging to the estate of Thomas Gay.

It was proved that Clampitt, the surveyor who made the survey, did not run this line in making the division of the land between the children and Mrs. Roberts.

The order confirming the partition of this tract of land vested in Mrs. Roberts that portion of the Gay tract, as

"shown and designated by the report of the commissioners,
and having metes and bounds according to field notes made
by the surveyor, Matthew A. Clampitt, and allotted and as-
signed by the commissioners to Eleanor Roberts." Thus the
confirmation of the court relates to the field notes, and not to
the plat. The whole proceeding of the court, in reference to
the partition of this land, shows that it was designed to divide
the whole of the Gay tract between Mrs. Roberts and the
children.

Under this state of facts, the court charged the jury, that
"under the partition between the heirs of Gay, Mrs. Roberts
(and the plaintiffs under her) took title to the western bound-
ary line of Gay's quarter, wherever that actually was; and
their rights would not be prejudiced by a mistaken call for
an erroneous line or corner."

This was a construction by the court, put upon the orders
of the County Court directing and confirming the partition of
the Gay tract of land between Mrs. Roberts and the children,
that, in legal effect, they amounted to a partition of the en-
tire tract between them, notwithstanding there might be a
mistaken call for an erroneous corner or line—doubtless re-
ferring to the mistake in the length of the line made by the
surveyor, indicated on that line in the plat by the figures
708, which it was proved he did not run. It was also a
construction of the deed executed by Mrs. Roberts and her
husband for the land to plaintiff, which described the land
conveyed by her as being the same as that which had been
allotted to her in the partition.

Again, the court charged the jury, in the same connec-
tion, that "the field notes in said partition speak for them-
selves, and they cannot be contradicted and controlled by
the figures in the plat attached to the survey."

This refers to a line in the survey of the land allotted to
Mrs. Roberts, which the field notes indicate as running from
the southeast corner of the Lawrence labor along its southern
boundary line, (south 75° west,) to the west boundary line of

Thomas Gay's quarter of a league; and the accompanying plat of the survey has placed over that line the figures " 708." This charge, considered in reference to the preceding charge, and in reference to its application to the evidence in this case, was designed to instruct the jury that the words in the field notes carried that line to the western boundary line of the Gay tract, wherever they might believe it to be; (which would take it 1,000 varas, if it went as far as the straight divisional line contended for by plaintiff;) and if they were satisfied, as the verdict upon the facts showed they were, that the Gay land extended west to the straight line, the fact that figures were on plat (" 708 ") was not such a fact as would have necessarily the effect to contradict and control the words of the field notes, and thereby prevent the land allotted to Mrs. Roberts from extending to the straight line.

If this charge had conveyed the idea to the jury that the existence of these figures on the plat was a fact to be entirely disregarded in determining the extent westward to which the land allotted to Mrs. Roberts went, it could only be justified by the words of the order of confirmation, defining the boundary of her tract by reference to the field notes, omitting therein any reference to the plat which might have been done designedly, as the commissioners were present when the land was run off for the division, and must have known the fact, testified to by one of them, and by Roberts, on the trial, that this line, on which the figures " 708 " were placed, was not run or measured in making the division between the Gay children and Mrs. Roberts.

In either point of view, this charge, in reference to the facts of this case, is not objectionable as a charge upon the weight of evidence, though ordinarily such a charge might be in reference to another state of facts.

There are other charges objected to, and exceptions taken to charges asked by the defendant and refused by the court. Most of them involve, in different phases, the questions of law that have already been discussed.

The main question in the case was one of fact, to wit: Which one of the two lines, the straight or the broken, was the true divisional line between the two quarters of the northern half of the Lynch league of land ?

So the court charged the jury, plainly; and further, that it was incumbent on the plaintiff to prove satisfactorily that the line claimed by him was the true divisional line. In the trial of the case, there was no question made about the dividing line of the league cutting off the north half, in which these three tracts of land were situated, to wit, the Allen, the Lawrence, and the Gay tracts; and there was no inquiry made as to why, when, or by whom it was run.

There was no question made about the locality of the Lawrence labor, which might or might not have been located on land previously sold to Allen; and although there was nothing to show whether it was or not, it was taken for granted on the trial that it was not located on the Allen tract. Two lines are found on the ground, in connection with the Lawrence labor, either of which may have been run thirty-five or forty years ago, and may have been run, in connection with the lines of the Lawrence labor, to mark and establish the divisional line between the Allen and Gay tracts of land. When, by whom, or for what purpose they were run, is not established, by any direct testimony of witnesses, or by records in evidence before the jury. There was no material evidence of acquiescence in either one of the lines, so as to make it the established line of division. Both the parties proceeded, in the trial, upon the hypothesis that one of these lines must have been authoritatively run as the divisional line, and the struggle between them was to ascertain by presumption which one it was. The verdict and judgment were for the plaintiff; and we find in the record no material error requiring a reversal.

AFFIRMED.

ON REHEARING.

Motion for rehearing was made and carefully argued. Opinion was rendered January 22, 1878; and motion for rehearing was filed February 8, 1878, and submitted March 27.

*Giddings & Morris,* for motion.

ROBERTS, CHIEF JUSTICE.—The motion for rehearing in this case was not filed within the fifteen days allowed by law; for which an excuse was rendered. The motion, with the brief filed in support of it, constitute a reargument of the whole case. Notwithstanding the motion was filed on the 8th of February last, it was not submitted until two days before the adjournment of the court.

The court, before deciding the case, had given it a thorough examination, and had fully consulted over all of the questions of law and fact presented in the record, and had given ample consideration to the views of counsel as contained in their briefs. In the reargument of the same questions now before us, in the shape of a motion to rehear the case, we find nothing that had not already been considered. It may not be amiss to suggest, that, in making such a motion, it will ordinarily be entirely sufficient to point out in such a motion briefly some mistake, or misconception of law or fact, into which the court has fallen, as exhibited in the opinion, with such reference to the record or to authorities as will call it to the attention of the court, without the labor and expense, on the part of counsel, of a full reargument upon all of the points.

Having again examined the case, again we adhere to the opinion delivered, and decline to grant the motion.

MOTION DENIED.